**In re Anonymous No. 56 D.B. 75**

Disciplinary Board Docket no. 56 D.B. 75.

REPORT OF HEARING COMMITTEE,
filed December 6, 1976

A. HISTORY OF THE CASE

On August 27, 1975, petitioner, office of disciplinary counsel, filed with the Disciplinary Board of the Supreme Court of Pennsylvania (board) a petition for discipline against respondent. The petition charged respondent with acts of misconduct which violated the Code of Professional Responsibility.

On August 27, 1975, the Secretary of the Disciplinary Board docketed the aforesaid petition for discipline at no. 56 D.B. 75.

On September 5, 1975, a true copy of the aforesaid petition for discipline was served upon respondent.

Respondent did not file an answer with the Disciplinary Board.

On October 7, 1975, the Disciplinary Board of the

Supreme Court of Pennsylvania referred the matter for hearing to hearing committee [ ] composed of [ ], [ ] and [ ].

A hearing before said hearing committee was scheduled to be held on December 10, 1975 at 10:00 a.m., in the offices of the Disciplinary Board, [ ], [ ], Pa. Respondent was notified of the hearing date by notice dated October 23, 1975.

At the aforesaid place and time the hearing commenced with all three members of hearing committee [ ] present.

[ ], Esquire, represented respondent; [ ], assistant disciplinary counsel, represented petitioner.

At the hearing petitioner presented five witnesses; the hearing was adjourned at 5:00 p.m. on the same day, to resume at a later date.

The hearing resumed on January 14, 1976, at the aforesaid place before hearing committee [ ], all members present. Petitioner presented one witness, concluding his case and respondent commenced his case and presented one witness. At the conclusion of that witness's testimony the hearing was adjourned to be resumed at a later date.

On Friday, February 27, 1976, the hearing resumed before all members of the hearing committee. Respondent presented two witnesses and respondent himself testified, whereupon the hearing was concluded. After hearing oral argument from the counsel for respondent and counsel for petitioner, the hearing committee directed petitioner to submit a brief and allowed respondent the right to submit a reply.

On June 29, 1976, petitioner submitted a brief. On August 27, 1976, respondent submitted a reply brief.

## B. FINDINGS OF FACT

1. On October 2, 1973 [A] informed respondent that she was pregnant and that the baby was due in January of 1974.

2. Approximately one week prior to the birth of the baby, [A] told respondent that she was having a baby and said to him that she wished to put the baby up for adoption; respondent indicated to her that he had some people who were looking for children.

3. Respondent asked [A] if she "wanted to make any money from the adoption." She replied, "no," all she wanted was a good home for the child and she wanted the child to be taken directly from the hospital into a home.

4. On or about October 24, 1973, an unwed mother, [A], gave birth prematurely to a baby girl in the [ ] Hospital.

5. In November 1973, [B], a practical nurse at the [ ] Hospital, learned through the Cardex (patient index) machine in the maternity ward that the aforesaid baby was available for adoption and that the person to contact with respect to the adoption was respondent.

6. [B] who knew that her sister, [C] desired to adopt a child, called respondent's office and spoke directly with respondent and requested information from him about the adoption of the baby in [ ] Hospital.

7. Respondent stated to [B] that "if you didn't have a lot of money, forget it" with respect to her questions about the possibility of adopting the child.

8. Respondent also mentioned to [B] that it would be necessary for the adopting mother to have at least about $5,000 for medical expenses.

9. Throughout October and November of 1973,

[B] kept [K] constantly informed as to the baby's condition.

10. On or about the beginning of November, [C] telephoned respondent, who identified himself.

11. [C] stated that she was calling in reference to the premature baby in [   ] Hospital who was up for adoption, and she asked respondent for a breakdown of the $6,000 figure which he gave to [B].

12. Respondent mentioned the figure of $6,000, which amount would include the attorney's fee for the [C's] counsel.

13. When [C] asked respondent-attorney for the breakdown of $6,000, respondent cited as expenses medical expenses, the cost of adoption, the mother's legal fees and the "mother's other expenses." Respondent specifically included among the "other expenses" the time that the mother lost from work when she was pregnant and money to get started on.

14. Respondent-attorney said that he was not going to get emotionally involved, and that he was not in the baby-selling business. When [C] commented that it seemed that much more money was involved than in her previous adoption, respondent said it was a "different time" and it was a "different morality."

15. On December 7, 1973, [C] gave a sworn statement before Judge [D].

16. [E], an attorney, had represented the [C] in a prior adoption proceeding.

17. [C] engaged [E], Esquire, to represent her with respect to her dealings with respondent about the prospective adoption of the baby in [   ] Hospital.

18. [E] telephoned respondent to discuss the adoption by the [C's] of the aforesaid baby girl; re-

spondent told [E] that he represented the mother of the child.

19. [E] asked respondent whether it was possible to obtain the mother's consent to have the [C's] adopt the child. Respondent replied that there would be a financial consideration involved. When [E] said that it was his experience that it was customary for the prospective adoptive parents to pay for the child's expenses and that [E] could recommend to his clients that if there were some hospitalization expenses the clients pay it, respondent said that he was not "in the baby-selling business" but it was going to cost more than that; and he then gave a figure which was either $5,000 or $6,000. When [E] asked him what that figure represented, respondent told [E] that it represented, in part medical expenses, in part a legal fee which the mother owed him, and in part the money that the mother needed to pay some bills of her own, and in part the money that the mother would need to get a "new start in life."

20. Respondent and [E] expressed to each other divergent views on the law regarding adoptions, in general, and what items it was proper for the adoptive parents to pay, in particular.

21. Following two conversations with respondent, [E] informed the [C's] that respondent was "selling babies," an impression that [C] had not received from respondent during her conversation with respondent.

22. [E] telephoned respondent a second time, and the second conversation was essentially a replay of the first. [E] tried to get respondent to reconsider his position but he did not succeed. Respondent said to [E] that there were other people involved who were also interested in the adoption and that

the mother had to choose between them. [E] indicated that his clients did not intend to "bid" for the baby.

23. In October of 1973, and for some time prior thereto, Mr. and Mrs. [F] were desirous of adopting a baby. One of the [F's] neighbors were friends with [G].

24. [G], a recent law school graduate and newly admitted member of the bar, had just begun as an associate in respondent's law firm.

25. The [F's] were advised by their neighbor that [G] was aware of a child that had been recently "put up" for adoption, and further, that [G] would call the [F's] to confirm the same.

26. [F] called first respondent's associate and thereafter respondent. When [F] asked respondent what the fee would be for the adoption of the baby, respondent replied that the medical bills would be expensive and that the "mother wanted money." [F] then stated that she would be willing to give money to her if it were legal to do so, and thereafter respondent became angry and stated that he was from a reputable firm and that he wouldn't "take the money and run."

27. [F] then said it sounds like she is selling her baby; respondent then in effect said, "What's to stop a woman or a mother from selling her baby? There's nothing against the law in selling her baby."

28. Respondent-attorney then said to [F], "There are plenty of people who would like to have this baby," and when asked how much does the mother want he stated, "it's not how much the mother wants. The whole package is $10,000." [F] then terminated the phone conversation.

29. During the course of their conversation, [F]

accused [A] of bartering her infant. "She is selling the baby."

30. [Mr. F] spoke with respondent after his wife, [F], did, and in an attempt to obtain a breakdown of the $10,000 figure, asked respondent to indicate what the specific costs were for the adoption of the baby; respondent replied that there were extensive expenses due to the complicated birth of a premature baby, and that the baby would be in a hospital for a length of time. Respondent also said that there would be a need for money for the mother, and when [F] asked whether this was legal or proper, respondent replied that the woman would have to be compensated for an excessive time lost from work, because of difficulties in labor and whatever, and that there would be money to the mother.

31. At no time did respondent state to [F] "I want $10,000." At no time did respondent mention legal fees, a stipend for [A] or a "payment" for the baby.

32. When [F] stated that it was not anywhere near the $10,000 sum, respondent replied, "Well, that's not a firm figure but I like to estimate high so we don't quibble over pennies later."

33. When [F] determined in his own mind that respondent was firmly fixed on a round figure of $10,000, [F] discontinued the telephone call.

34. Following his conversation with [F], respondent severely reprimanded [G].

35. The baby was released at [   ] Hospital after [A] had signed the necessary papers.

36. Mrs. [H] had worked as a secretary for respondent. Their relationship was a warm and friendly one, each regarding the other quite highly.

37. For some time prior to the incidents described hereinafter, respondent was aware that [H] and her husband, already the adoptive parents of a

Korean child, were desirous of adopting more children.

38. In November of 1973, respondent advised [H] that an infant would be available for adoption.

39. On December 1, 1973, [H] took custody of the infant and, in subsequent proceedings in New Hampshire, effectuated the adoption.

40. Respondent knew that [A] was on public assistance prior to the birth of the child.

41. While respondent-attorney did not research the law with respect to his client's responsibility to reimburse public assistance for paying for the birth of her child, at the time that he was advising [A] he did not think that she was liable for public assistance payments in a situation like this, i.e., where she gave birth to an illegitimate child.

42. [H] did not make any payments for hospital bills for either the mother or the child; she did, however, pay indirectly for the cost of a pediatrician.

43. Respondent received no money for services rendered in connection with the entire matter.

44. An investigation of the aforesaid incidents was begun by the district attorney's office of [   ] County; the investigation was terminated because the then district attorney, now Judge, [I], determined that nothing respondent had done involved a criminal action.

## C. DISCUSSION

The first charge against respondent is that he violated D.R. 1-102(A)(3), dealing with illegal conduct involving moral turpitude. The alleged "illegal conduct" was the violation of the Act of December 6, 1972, P.L. 1482, 18 C.P.S.A. §4305 (relating to dealing in infant children), or 18 C.P.S.A. §901 (re-

lating to criminal attempt), or 18 C.P.S.A. §902 (relating to criminal solicitation).

"Moral turpitude" can be defined as an act of baseness, vileness, or depravity. No one can question the conclusion that if the hearing committee determined that respondent was guilty of violating any one of the aforementioned sections of the Crimes Code, it involved moral turpitude. It is, therefore, necessary to determine if the evidence presented to the committee was sufficient to sustain petitioner's burden of proof.

There are three provisions of the Pennsylvania Crimes Code which are pertinent to the inquiry as to whether respondent has committed "illegal conduct." They are:

(1) "Dealing in infant children

"A person is guilty of a misdemeanor of the first degree if he deals in humanity, by trading, bartering, buying, selling, or dealing in infant children." 18 C.P.S.A. §4305.

(2) "Criminal attempt

"(a) Definition of attempt. A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 C.P.S.A. §901.

(3) "Criminal solicitation

"(a) Definition of solicitation. A person is guilty of solicitation to commit a crime if with the intent of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct which would constitute such crime or an attempt to commit such crime or which would establish his complicity in its commission or attempted commission." 18 C.P.S.A. §902.

The important words in the above-quoted section 4305 are "trading, bartering, buying, selling and dealing." There is no evidence that respondent traded, bartered or bought the child in question, consequently, these elements of the crime can be dismissed. Respondent never sold the child since it ended up being adopted by [H] with no money changing hands.

As to whether or not respondent dealt in infant children, is a more difficult problem. The word "deal" has been defined as "taking action, trafficking, or trading." This committee has come to the conclusion that petitioner has not met his burden of proving that respondent dealt in infant children. It is interesting to note that this same conclusion was reached by the district attorney of [   ] County when he decided not to press criminal charges against respondent.

The basis of the committee's conclusion is that while there were conversations concerning the expenses involved in adopting the child, no actions were ever taken by respondent which did, or could have led to the crime of dealing in infant children. No specific sums were mentioned, nor were any specific arrangements made with any of the persons involved with the exception of [H], who finally ended up adopting the child through proper court procedures.

It must now be determined if respondent violated section 901 (relating to criminal attempt) in that he attempted to trade, barter, buy, sell or deal in infant children. The important words in that section are "substantial step." The committee would have to make a determination that respondent took a substantial step toward the commission of the crime of dealing in infant children in order to find a violation.

A reading of the testimony discloses that steps were taken by respondent toward the commission of the crime when he mentioned figures to [C] and [F], but the figures were never concrete ones and were always tied in with statements concerning the high medical bills. For this reason the committee came to the conclusion that substantial steps were not taken and respondent did not violate section 901.

With respect to the Crimes Code, petitioner charged respondent with a violation of section 902 (relating to criminal solicitation). The important words in that section are "commands, encourages or requests." To be guilty of violating this section, respondent would have to have commanded, encouraged or requested [A] to sell her baby. There is absolutely no evidence of this. At the very most, the record shows that respondent asked [A] what her intentions were regarding making money from the prospective adoption of her child. From this, it could be said that if respondent discovered that she intended to make money on the adoption he would not represent her. No testimony was presented by petitioner to rebut this, therefore, the committee concludes that respondent did not violate the criminal solicitation section of the Crimes Code.

For the above reasons, we feel that petitioner has failed to meet his burden with respect to the alleged violation of D.R. 1-102(A)(3).

Respondent is also charged with violation of D.R. 1-102(A)(4), dealing with conduct involving dishonesty, deceit and misrepresentation. There is no misrepresentation here since there is no evidence that respondent misrepresented any fact unless it can be said that the statements he made to various persons about the size of the medical bills were misrepresentations in view of the fact that they

were being paid by Public Assistance. Finding of fact no. 41 concludes that respondent did not research the law with respect to his client's responsibility to reimburse Public Assistance for the birth of her child. He stated that he did not think she was responsible, but the committee feels that what a person thinks he knows, and what he actually knows, are two different things. Had respondent researched the law and came to the conclusion that [A] did not have to pay, yet he continued to tell various persons that the medical bills were going to be high, we feel there would have been a misrepresentation, if not to his client, then to persons displaying an interest in adopting the child.

The same reasoning can be used with respect to the questions of dishonesty and deceit. If respondent honestly knew that there would be no medical bills, or if he deceived persons concerning the amount of the bills, a violation of D.R. 1-102(A)(4) would have taken place, but the committee feels that petitioner has not met the burden of proof placed upon him. No exact figures were given, only generalities, therefore there could be no deceit.

The third charge against respondent is the violation of D.R. 7-102(A)(7), dealing with counselling or assisting a client in conduct that the lawyer knows to be illegal or fraudulent. In order to find a violation of this section, it would be necessary for the committee to find that respondent gave advice to [A], who was his client, concerning the making of money from the adoption, or assisted his client in conduct which he knew to be illegal.

On the latter point, respondent is presumed to know the law and the law is that dealing in infants is illegal. The committee has already come to the conclusion that the law was not violated by respondent, but the question now before it is whether

or not he assisted his client in violating the law. The conclusion here must be the same. To assist is to aid, and a complete reading of the testimony of [A] and respondent on this point discloses no aid given to her except in securing the release of the child from the hospital, which action cannot be deemed sufficient to find that this assisted her in violating a law. This committee is not empowered to determine if [A] violated the law. Since there is no evidence that she did, how can we find that respondent assisted her?

The first point on this charge concerning the counselling of his client has been covered in the discussion on the criminal solicitation charge. We have already come to the conclusion that when respondent asked the mother if she wanted to make money from the adoption, he was inquiring of her intentions, and if the answer had been yes, he would not have represented her. This is confirmed by his testimony (N.T. 2-27-76—84 & 85).

The final charge against respondent is that he violated D.R. 7-102(A)(8), dealing with knowingly engaging in illegal conduct. It is obvious that the committee would have to find that there was illegal conduct before respondent can be found in violation of this section. We have concluded, while dismissing the first charge, that there was no illegal conduct on the part of respondent, therefore this charge must also fall.

## D. CONCLUSIONS OF LAW

1. The respondent has not violated D.R. 1-102(A)(3).

2. The respondent has not violated D.R. 1-102(A)(4).

3. The respondent has not violated D.R. 7-102(A)(7).

4. The respondent has not violated D.R. 7-102(A)(8).

## E. RECOMMENDED DISPOSITION OF THE PETITION

We recommend that the petition be dismissed.

## PRIVATE REPRIMAND

UNKOVIC, *Board Member,* May 13, 1977—As you previously have been notified, the Disciplinary Board on January 28, 1977, determined that the petition for discipline filed against you, docketed at 56 D.B. 75, should be concluded by private reprimand. You were subsequently notified by certified mail, under date of March 31, 1977, to appear at this meeting of the board, for the purpose of receiving the private reprimand.

The record indicates that you have been found guilty of transgressing Disciplinary Rule 1-102(A)(4), dealing with conduct involving dishonesty, deceit and misrepresentation.

It is fortunate for you that the board determined only the imposition of a private reprimand and not a form of public discipline.

As Chairman of the Disciplinary Board, it is my duty to reprimand you for your misconduct. We urge that you conform to the code of professional responsibility in your future activities. Any subsequent transgressions on your part can only result in further discipline and perhaps more drastic sanctions. We sincerely hope that you will comport yourself in such a manner that future disciplinary action will be unnecessary.